UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID EISENBACH, GEORGE H. EISENBACH, JOANNE EISENBACH, JENNIFER YOUNG, DANA CARINI, ROSEMARIE ORSHAKOSKI, MICHAEL ORSHAKOSKI, JONATHAN D. CHAMPLIN, ANNE CHAMPLIN, RAYMOND H. CHAMPLIN, KENNETH LEVINE, CATHERINE POLERA, JULIEN DAVIES HOPE ROGERS, PHIL WEISS, CYNTHIA KING, JO MANGO, and LAURALEE HOLMBO,

Docket No. 20-CV-08566

Plaintiffs/Petitioners,

**COMPLAINT AND PETITION**

-against-

VILLAGE OF NELSONVILLE, VILLAGE OF NELSONVILLE ZONING BOARD OF APPEALS, VILLAGE OF NELSONVILLE PLANNING BOARD, WILLIAM BUJARSKI, as Building Inspector of the Village of Nelsonville, HOMELAND TOWERS, LLC, NEW YORK SMSA LIMITED PARTNERSHIP d/b/a VERIZON WIRELESS, and NEW CINGULAR WIRELESS PCD LLC d/b/a AT&T,

Defendants/Respondents.

## Statement of the case

1.      This lawsuit challenges the legal sufficiency of the Consent Order[1], which represents a collection of defective land use decisions.  As a contractual remedy, the Consent Order's authority derives from the statutes it implements; specifically, the TCA,[2]

---

[1] Reference is made to a certain Stipulation of Settlement and Consent Order, dated January 29, 2020 (the "Consent Order"), which is attached as Exhibit "A", entered in the action styled:  *New York SMSA Limited Partnership d/b/a Verizon Wireless and Homeland Towers v. The Village of Nelsonville, et al.*, Docket No. 18-cv-5932 (Briccetti, J.) (the "DJ Action").

[2] 47 U.S.C. § 151, *et seq.* ("Communications Act" or "TCA")

NEPA,[3] SEQRA, and ESA.[4]   As a judicial act, endorsing the Consent Order bypassed indispensable environmental review that should have first been implemented.  This action implicates the Court's approval of the Consent Order as violating federal and state laws, and thus failing to promote the objectives envisioned by the TCA, NEPA, SEQRA, and the ESA.

2.      Now, this Court must vacate, annul, and set aside the Consent Order.

3.      In the DJ Action, the Providers[5] sought to enforce alleged TCA violations relating to the Village constructively denying its applications for site plan approval and a variance to construct a one-hundred ten-foot (110') monopine tower and ancillary wireless telecommunications equipment in the Village of Nelsonville.

4.      The Providers mainly targeted the Village's delays, flawed environmental significance review of the project under SEQRA, and its failure to make a significance determination before denying their applications.  The Providers also asserted claims for direct violations of TCA § 704.  The Village caved to the hefty thud of the Providers' claims in the DJ Action, which resulted in the *de facto* approval of the Providers' applications.  These were previously met with heavy public opposition.

5.      This "sue and settle" gambit paid off for the Providers, but prevented interested members of the public from a meaningful opportunity to participate in the SEQRA process.   In its role as *parens patriae*, the Village failed in adequately representing the interests of its citizens, who now bring this action.

---

[3] The federal policies embodied by National Environmental Policy Act ("NEPA") are implemented at the state level in this case by the New York State Environmental Quality Review Act, which is promulgated under 6 NYCRR Part 617, *et seq*. ("SEQRA").
[4] 16 U.S.C. § 1531, *et seq*. (the "ESA").
[5] Collective reference is made to Homeland, Verizon, and AT&T (the "Providers").

6.  Plaintiffs also seek to vacate, annul, and set aside the building permit issued to Homeland on June 15, 2020 to construct a 95-foot tall monopine tower to distribute wireless telecommunications services, for ancillary equipment, and site work including construction of retention walls and a roadway (the "Building Permit").

7.  At its essence, this case is about balancing the implementation of environmental significance review with the TCA's mandate of promoting the swift development of wireless telecommunications infrastructure.

8.  The Communications Act does not entirely preempt NEPA and SEQRA by virtue of the Supremacy Clause of the U.S. Constitution.  But a balance must be struck between preserving federal interests in developing wireless technology infrastructure and implementing mandatory environmental review.

## Jurisdiction and venue

9.  The declaratory and injunctive relief Plaintiffs seek are authorized by 28 U.S.C. §§ 2201 and 2202 and FRCP[6] 57.

10.  This Court has subject matter jurisdiction pursuant to 28 U.S.C §§ 1331 and 1343.

11.  Venue in the Southern District of New York is proper under 28 U.S.C. § 1391(b)(2) as Plaintiffs' claims arose in the Ninth Judicial District.

12.  Jurisdiction over Plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

13.  The Court has pendent jurisdiction over Plaintiffs' claims arising under CPLR[7] § 7803(3).

---

[6] Fed. R. Civ. P. ("FRCP").
[7] New York Civ. Prac. L. & R. ("CPLR").

14. Pursuant to CPLR § 271 this hybrid special proceeding is timely because it is within four months of the Building Permit being issued on June 15, 2020.

15. No prior application for similar relief has been sought from this Court or any other court of competent jurisdiction.

## The parties and their legal standing

16. Plaintiffs/petitioners David Eisenbach, George H. Eisenbach, and Joanne Eisenbach are individuals who own and/or reside on real property known as 34 Billy's Way, Cold Spring, New York 10516 (the "Eisenbach Property").

17. Plaintiffs/petitioners Jennifer Young and Catherine Polera are individuals who own and/or reside on real property known as 449 Lane Gate Road, Cold Spring, New York 10516  (the "Young Property").

18. Plaintiffs/petitioners Dana Carini and Julien Davies are individuals who own and/or reside on real property known as 75 Moffat Road, Cold Spring, New York 10516 (the "Carini Property").

19. Plaintiff/petitioners Rosemarie Orshakoski and Michael Orshakoski are individuals who own and/or reside on real property known as 115 Moffat Road, Cold Spring, New York 10516, (the "Orshakoski Property").

20. Plaintiff/petitioner Jonathan D. Champlin, Anne Champlin, and Raymond H. Champlin are individuals who own and/or reside on real property known as 9 Rockledge Road, Nelsonville, New York 10516 (the "Champlin Property").

21. Plaintiff/petitioner Kenneth Levine is an individual who owns and/or resides on real property known as 103 Healy Road, Nelsonville, New York 10516 (the "Levine Property").

22.     Plaintiff/petitioner Hope Rogers is an individual who owns and/or resides on real property known as 160 Moffat Road, Cold Spring, New York 10516 (the "Rogers Property").

23.     Plaintiffs/petitioners Phil Weiss and Cynthia King are individuals who own and/or reside on real property known as 752 East Mountain Road South, Cold Spring, New York 10516 (the "Weiss Property").

24.     Plaintiff/petitioner Jo Mango is an individual who owns and/or resides on real property known as 392 Main Street, Nelsonville, New York 10516 (the "Mango Property").

25.     Plaintiff/petitioner Lauralee Holmbo is an individual who owns and/or resides on real property known as 6 Parsonage Street, Cold Spring, New York 10516 (the "Holmbo Property").

26.     The Champlin Property is within very close proximity (i.e. less than five hundred (500) feet) to the Project, thus intensifying its adverse physical and environmental impacts--both qualitatively and quantitatively--from the general public and community

27.     The Eisenbach Property, Young Property, Carini Property, Orshakoski Property, Champlin Property, Levine Property, Rogers Property, and Weiss Property are within close proximity (i.e. less than one thousand five hundred (1,500) feet) to the Project, which still magnifies its adverse environmental impacts to a greater degree than the general public and community.

28.     The Mango Property and Holmbo Property are close enough to the Project that its adverse impacts will still yield an impact and permanent harm different that those cast on general public and community.

29.     Each of the individual properties identified in Paragraphs 16-25, above, are in such close proximity to the Project and the Premises to generate adverse environmental impacts that are unique and fundamentally different from the public at large including:

(a)     negative visual impacts (e.g., Project bulk and scale from building elements, and increased light and visual pollution);

(b)     physical disturbances to natural habitats due to Project site disturbances, grading, and an increase in impervious surface coverage on the Premises;

(c)     increased stormwater runoff causing erosion and sedimentation;

(d)     destruction and elimination of native wildlife habitats such as birds, bats, mammals, and native plant species;

(e)     displacement of rare and protected species of plants and animals including Indian Bats and Northern Long-eared Bats; and

(f)     displacement of native animals that once frequented the Premises and surrounding properties of plaintiffs.

30.     The Project's individual and cumulative environmental impacts will uniquely and particularly impact Plaintiffs due to their proximity, alone, to the Project.

31.     The failure to consider private rights of way and limited means of access to the Premises over private roads or ways could also seriously compromise access to the Project and the Premises.

32.     Plaintiffs will otherwise be directly and uniquely impacted by the Project and its adverse physical and environmental impacts.

33.     Upon information and belief, the Village is a municipal corporation organized and existing under New York State laws with its principal office located at Village Hall, 258 Main Street, Nelsonville, New York 10516.

34.     The Village, as a municipality, its departments, bureaus and officers thereof, is empowered and responsible to perform and exercise all powers, duties, privileges and immunities granted to it by the United States Constitution, New York State Constitution and other applicable provisions of law.

35.     Upon information and belief, the Planning Board was and is a duly constituted board created by the Village pursuant to Article 2 of New York's Village Law and the Village's Charter, Local Laws, Ordinances, and Resolutions.

36.     Upon information and belief, the ZBA was and is a duly constituted board created by the Village pursuant to Article 2 of New York's Village Law and the Village's Charter, Local Laws, Ordinances, and Resolutions.

37.     Homeland is a domestic limited liability company having an office located at 9 Harmony Street, 2nd Floor, Danbury, Connecticut 06810.

38.     Verizon is a limited partnership authorized to do business in the State of New York having an office located at One Verizon Way, Basking Ridge, New Jersey 07920.

39.     AT&T is a domestic corporation authorized to do business in the State of New York.

40.     Defendants[8] are each a "person" subject to suit and are being sued for declaratory relief, injunctive relief, or seeking judicial review of a final agency action(s) discharged in their capacity as a Village official or a duly constituted board.

## Statutory background

### A.      The Communications Act

41.     In 1996, Congress amended the Communications Act of 1934 to establish "a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all markets to competition."[9]  These amendments were designed to dismantle legal, operational, and financial barriers to telecommunications markets that had previously stifled competition in the past.

42.     TCA § 253(a) embodies this preemptive mandate in providing that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."[10]

43.     The Supremacy Clause of the U.S. Constitution empowers Congress to preempt state or local laws or regulations under certain specified conditions.[11]   And

---

[8] Defendants/respondents the Village of Nelsonville ("Village"), Village of Nelsonville Zoning Board of Appeals ("ZBA"), Village of Nelsonville Planning Board ("Planning Board"), William Bujarski, as Building Inspector of the Village of Nelsonville (the "Building Inspector") (collectively, the "Village"), Homeland Towers, LLC ("Homeland"), New York SMSA Limited Partnership d/b/a Verizon Wireless ("Verizon"), and New Cingular Wireless PCD LLC d/b/a AT&T ("AT&T") (collectively, the "Defendants").
[9] S. Conf. Rep. No. 104-230, 104th Cong., 2d Sess. 1 (1996).
[10] 47 U.S.C. § 253(a).
[11] *See, e.g., Louisiana PSC*, 476 U.S. at 368

preemption of state law or regulation occurs "when there is outright or actual conflict between federal and state law."[12]

44.     However, TCA § 332(c)(7) entitled "preservation of local zoning authority" delegates state and local authority over zoning and land use decisions for personal wireless service facilities albeit with specific limitations on that authority. For example, state or local governments may not discriminate against providers of functionally equivalent services and must act on applications within reasonable periods of time.[13]

45.     Allegations that a state or local government has acted inconsistently with TCA § 332(c)(7), *et seq.* are justiciable controversies that may be litigated.

## B.     NEPA and SEQRA

46.     NEPA is "our basic national charter for protection of the environment."[14] The statute was conceived with the purpose of prioritizing comprehensive environmental analysis to ensure that federal agencies carefully examine the environmental significance and range of potential impacts from their decisions before they are undertaken.  NEPA also ensures that the public is made aware of the range of environmental effects and impacts attending land use applications and agency decision-making.

47.     To license new wireless communications facilities, the FCC requires that project proponents identify all actions that may have a significant environmental effect for which environmental assessments must be prepared, and this includes:

> (i)     Facilities that: (i) may affect listed threatened or endangered species or designated critical habitats; or (ii) are likely to jeopardize the continued existence of any proposed endangered or threatened species or likely to result in the destruction or adverse modification of proposed critical

---

[12] *Louisiana PSC*, 476 U.S. at 368, *citing*, *Free v. Bland*, 369 U.S. 663 (1962).
[13] *See* 47 U.S.C. § 332(c)(7)(B) for a full list of enumerated limitations.
[14] 40 C.F.R. § 1500.1(a).

habitats, as determined by the Secretary of the Interior pursuant to the Endangered Species Act of 1973 ("ESA"); and

(ii)　Facilities that may affect districts, sites, buildings, structures or objects, significant in American history, architecture, archeology, engineering or culture, that are listed, or are eligible for listing, in the National Register of Historic Places.[15]

48.　In New York, NEPA's charter and purpose is mechanized through SEQRA.

49.　Every land use decision requires that the reviewing agency examine the proposed action's impact on the environment by implementing the stages of the SEQRA review process.[16]

50.　SEQRA's implementing regulations require that "[n]o agency involved in an action may undertake, fund or approve the action until it has complied with the provisions of SEQRA.[17]　In determining the environmental significance of land use decisions, the reviewing agency is charged with classifying the types of actions comprising a land use and the potential to yield an adverse environmental impact.

51.　Type I or Unlisted actions under SEQRA are more likely to have significant adverse environmental impacts.[18]　By contrast, Type II actions involve activities that have been found by New York State as having no significant environmental impacts. These actions are statutorily exempt from SEQRA review.[19]　Type II actions do not require preparation of an EAF, a negative or positive declaration of environmental

---

[15] 47 C.F.R. § 1.1307(a)(3) and (4); 16 U.S.C. § 470f., which is also referred to as Section 106 of the National Historic Preservation Act ("NHPA").
[16] 22 N.Y.C.R.R. Part 617.
[17] 6 NYCRR 617.3(a).
[18] 6 NYCRR § 617.4.
[19] 6 NYCRR § 617.5(a).

significance, or an EIS.  SEQRA regulations enumerate certain actions as Type II, which are categorically excluded from SEQRA review.[20]

52.    Here, leaving aside how the Project could have or should have be typed under SEQRA, the Village avoided this mandatory review process altogether.[21]

### Factual background

53.    The Providers develop and operate telecommunications infrastructure to provide mobile telephone and other wireless communication services nationwide by the grant of licenses from the Federal Communications Commission.

54.    Through the adoption of federal mandates, regulations, and as promulgated through acts of Congress, the proliferation of telecommunications facilities--in particular, wireless communications--is a widely-recognized demand throughout the United States. To that end, telecommunications companies including the Providers closely study and deploy resources to ensure consistency and wireless communication services and to avoid interruptions and gaps in wireless service coverage.

55.    Telecommunications companies regularly analyze and perform studies assessing the above referenced infrastructure and wireless communication needs throughout New York State.  In particular, the Providers recently identified natural topographical features throughout the Village of Nelsonville making it prone to wireless transmission and reliability problems for to personal wireless service coverage and emergency service providers.

56.    To this end, the Providers sought to locate and install a wireless service generating facility on a certain 9.63-acre tract of real property known as 15 Rockledge

---

[20] 6 NYCRR 617.5(c).
[21] Complaint, ¶¶ 141-143.

Road, Nelsonville, New York 10516 (the "Premises").  Originally, they sought permission
to construct this antenna and ancillary equipment by means of a special use permit as
required by Code § 188-67, *et seq.*  In addition, because the Premises is landlocked, the
Providers requested interpretive relief from the ZBA to determine the need for a variance
from New York State Village Law § 7-736, which requires that a property be accessible
by a street recognized on a duly filed and recorded plat. Additionally, the Providers
required site plan approval from the Planning Board.  The Providers made these three
applications to the Village as detailed below (collectively, the "Applications").

### A.     *Planning and Zoning Board Proceedings*

57.     On July 20, 2017, the Providers filed applications for special use permit, an
application for variance with the ZBA, and a site plan application with the Planning
Board in connection with the Project.  Subsequently, the Providers supplemented the
Applications with a host of correspondence and submissions detailing physical and
engineering data supporting the Project, area analyses assessing deficiencies in the need
for enhanced wireless services, and a long form environmental assessment form.

58.     The Building Inspector then referred the Project to the ZBA for review of
its special use permit application for relief from Village Law § 7-736.  If approved by the
ZBA, the Planning Board would have then considered the Project's site plan application.

59.     In the ensuing year, the Providers made numerous submissions to the ZBA
and Planning Board supplying additional engineering data, radiofrequency studies,
consulting reports and analyses, and correspondence supporting the Project.  In response,
the Village engaged engineers and site planning professionals to analyze the Project's
numerous components to provide feedback and guidance to the Village in its review.

60.     The Village's professional consultants made findings including that gaps in wireless coverage existed in the process of reviewing Project submissions.

61.     On or about October 18, 2017, counsel for the Providers supplied correspondence from New York State's Historic Preservation Office "(SHPO") to the ZBA and Planning Board identifying that the Project, in its then-form, would not adversely affect those districts, sites, buildings, structures, or objects either listed or eligible for listing on the National Register of Historic Places.

62.     In October, 2017, the Planning Board began questioning the need for alternative site proposals from that of the Premises.  The Providers, in turn, identified a lack of feasible alternatives to the Project including four nearby church steeples of significantly less height and a 120-foot tall facility located at 2 Secor Street, which was owned by the Village.    Ultimately, these alternatives failed due to engineering insufficiency and heavy public opposition.

63.     On November 15, 2017, the ZBA and Planning Board commenced their joint public hearings on the Applications.

64.     From November 15, 2017 through April 4, 2018, both boards held protracted public hearings, during which time Project opponents raised a plethora of objections.  Chief among these objections was the Premises being landlocked.  Access was proposed over a private right of way.  For decades, the strip of private property known as "Rockledge Road" was used exclusively and uninterrupted as access to various landlocked parcels including the Premises for personal use.  Certain Project opponents argued that the Providers (specifically, Homeland) proposed a use entirely outside of the scope of the right-of-way through their building permit application.

13

65.     Major Project objections also included disputes over demonstrating significant gaps in wireless coverage and actual need to provide such communication services by constructing a tower.

66.     Opponents also cited the Project's negative aesthetic and environmental impacts on the Cold Spring Rural Cemetery, which had recently been listed as a property of historic significance.

67.     Many homeowners living in close proximity to the Project including Plaintiffs spoke out against its adverse aesthetic and environmental impacts that would be foisted upon them especially given their proximity to it.

**B.     *Deciding the Applications***

68.     On May 30, 2018, the ZBA and Planning Board convened a joint meeting to decide the Applications.  At this meeting, the ZBA extensively discussed the progress of the Applications and alternative concepts to a one-hundred and ten (110) foot monopine antenna.  Ultimately, Project alternatives were abandoned.

69.     The boards discussed that granting the Applications required two conditions, the first being that telecommunications facility be made available for public safety purposes and the second that tree preservation and screening be prioritized.

70.     The boards discussed the viability of potential alternative locations for the Project and the lack of a viable alternative to the Project being sited on the Premises.

71.     The ZBA Chairman then discussed in detailed architectural and historical basis for conserving the cultural and strict aesthetic characteristics surrounding the Premises including the Cold Spring Cemetery.  He then concluded that deciding the fate of such wireless telecommunications facilities in the village of Nelsonville was best suited

to local boards rather than "a Federal District Court judge" dictating their future.[22]   The ZBA Chairman then voted in favor of the Providers' special use permit application.

72.   ZBA Member Clements then followed by articulating her concerns to preserve viewsheds and visual impacts she believed exceeded the Code, and subsequently voting against the application.   Two additional "no" votes followed and then a final vote in favor of the special use permit application.

73.   The ZBA denied the Providers' special use permit application by a 3-2 vote.

74.   When prompted by Homeland's attorney, the ZBA's attorney then indicated that the related applications before the ZBA for relief from Village Law § 7-736 and for site plan approval were constructively denied.

75.   On June 12, 2018, the ZBA published notice of its decisions.

## C.   *The DJ Action.*

76.   On June 29, 2018, the Providers commenced litigation against the Village alleging a host of federal and state claims.   In particular, the Providers asserted the following ten causes of action against the Village:

| Count | Nature of relief sought |
|-------|------------------------|
| 1 | ZBA determinations not in writing: 47 U.S.C. § 332(c)(7)(B)(iii) |
| 2 | Village's actions violated FCC "Shot Clock Order": 47 U.S.C. § 332(c)(7)(B)(ii) |
| 3 | Effective denial of applications: 47 U.S.C. § 332(c)(7)(B)(iii) |
| 4 | Effective prohibition: 47 U.S.C. § 332(c)(7)(B)(i)(II) |
| 5 | Prohibition of services, bar to entry, and unreasonable discrimination:  47 U.S.C. § 253 |
| 6 | Excessive fees |

---

[22] Reference is made to Page 70, Lines 2-324 of the transcript of proceedings from a joint meeting of the ZBA and Planning Board held on May 30, 2018 and accompanying transcript that is available at: https://static.wixstatic.com/ugd/b667a0_176ee59251a9446d8e17f92ee1487ab8.pdf.

| 7 | Judicial review (CPLR Article 78) |
| 8 | Violation of Freedom of Information Law |
| 9 | New York Constitutional claims alleging violation of 5th Amendment and Taking |
| 10 | Violation of Open Meetings Law by illegal executive session |

77.     On July 30, 2020, the Village appeared in the DJ Action by filing an answer with broad and qualified denials and raising stock affirmative defenses.  The Village did not interpose any counterclaims.

78.     On January 29, 2020, the DJ Action was then settled by executing the Consent Order, which reduced the height of the monopine tower from 110 feet to 95 feet.[23] Additionally, the Consent Order outlined physical, environmental, and aesthetic parameters to mitigate the Project's imposing nature, chief among them:

(a)     surrounding the telecommunications facility on the premises with 8-foot-high cedar privacy fencing;

(b)     implementing security and lighting systems designed to minimize or eliminate light pollution;

(c)     minimizing or eliminating the Project's noise pollution;

(d)     reserving certain Project elements for the Building Inspector's "reasonable approval" at the "building permit stage"[24] such as monopine tower color, retaining wall design and appearance, retaining wall fencing, level spreader sizing and stone riprap at pipe outlets, and layout and geometry of the site access driveway;

(e)     simulation of a pine tree to the greatest extent commercially reasonable for the monopine tower with high density branches in needles running from the top down to approximately 40 feet above finished grade consistent with attached drawings; and

(f)     installation of vegetative screening and camouflaged netting and fencing.

---

[23] A true and correct copy of the Consent Order is attached as Exhibit "B".
[24] Neither of these phrases are defined in the Consent Order.

(the "Consent Order Site Modifications"); (Consent Order, ¶ 2).

79.     Upon successfully completing the Consent Order Site Modifications, the Building Inspector was required to issue a certificate of compliance within fifteen (15) days. (Consent Order, ¶ 4).

80.     The Providers were also required to establish a $30,000 fund "to be held and distributed by the Village to nearby property owners to install landscaping" and the Providers "have no responsibility to maintain any such landscaping." (Consent Order, ¶ 6). No further specificity was provided on how this parameter would be implemented.

81.     Oddly, the Consent Order also recites that "the Village makes no representation whatsoever whether the ability or authority to construct or maintain the proposed improvements in Exhibit A are within the rights Plaintiffs claim under the 'Existing Rockledge Road Access Easement' (Liber 667, pg. 615) referenced therein."[25] (Consent Order, ¶ 8)

82.     Perhaps the most controversial recitation is that "this Consent Order shall be deemed a Type II action under the New York State Environmental Quality Review Act, as it is the action of a court. 6 N.Y.C.R.R. § 617.5(c)(46)." (Consent Order, ¶ 13).

**D.     Project changes and building permit review**

83.     Since the ZBA denied the Providers' special use permit application and constructively denied the balance of the sought-after relief *nearly two years and six*

_____

[25] This reference is believed to harken back to significant neighbor opposition to the Applications addressing whether the Homeland, as successor-in-interest to the Premises, is actually possessed of a right, title, or interest to the right of way providing access to the otherwise landlocked Premises. This issue is concurrently being litigated by interested parties in State Court (i.e. Supreme Court of the State of New York, Putnam County).

*months ago*, the Project has undergone significant changes beyond the Consent Order

Site Modifications.

84.     Shortly after adopting the Consent Order, the Providers filed an application

for building permit for the Project with the Village's Building Department.

85.     By a rejection letter, dated March 26, 2020, the Building Inspector cited

substantial changes to the Project including:

> (a)     Significantly less detailed plans than the original set supplied
> to the Court in the DJ Action (i.e. fewer drawings, details, and
> Code compliance tables);
>
> (b)     Realignment of the access drive to and on the Premises
> requiring potential removal of additional trees;
>
> (c)     Lack of compliance with NYS Fire Code including omission of
> the required "turnaround" and omission of emergency access
> key box;
>
> (d)     Omission of two required parking spaces required by Code;
>
> (e)     Drive profile reflecting gradient of 14.89% exceeding NYS
> Fire Code maximum of 10%;
>
> (f)     Omission of drawings reflecting nature, appearance, and
> positioning of communications tower pole; and
>
> (g)     Omission of retaining wall design reflecting appearance and
> structural composition.

86.     By letter, dated May 28, 2020, Homeland responded to the Building

Inspector's deficiency letter including access drive realignment:

> "the access drive has been realigned in consideration to minimizing
> impacts to the subject property both during and after completion of
> construction. The minor realignment of the axis driveway avoids
> significant exposed rock outcroppings, thereby aiming to minimize
> the need for unnecessary rock removal."

Addressing increased tree removal, Homeland responded:

> "the minor [access drive] realignment requires different trees to be removed while others previously marked for removal would now remain. This would serve to benefit adjacent properties as some of the required tree removal would be further from the property line. An updated survey within the area of disturbance has been provided."

87.     On June 15, 2020, the Building Inspector issued a building permit to Homeland.

88.     Despite the issuance of a building permit to Homeland, significant and unstudied changes were made to the Project after execution of the Consent Order:

| Issue | As represented in construction drawings (March 13, 2020) | As represented in construction drawings (May 18, 2020) |
|---|---|---|
| Tree removal | 43 trees | 66 trees |
| Parking | None shown | 2 spaces |
| Concrete pads | None shown | 10' x 12' pad (Verizon) 10' x 18' pad (AT&T) |
| Monopine tower | Branches in even, conical shape | Branches and appearance more naturally contoured[26] |

(the "Additional Project Changes").

89.     The Additional Project Changes were not considered by the Village or the ZBA, as lead agency under SEQRA.  Nor were they contemplated by the parties to the DJ Action and the Court before adopting the Consent Order.

---

[26] In a subsequent construction drawing, dated June 12, 2020, the monopine branches and shape revert back to a slightly tapered version of the branch design and density shown in the construction drawing, dated March 13, 2020.  There is no explanation for this significant visual and aesthetic change *after* the issuance of the building permit.  True and correct copies of these three construction drawings are attached as Exhibit "C".

90. Individually, each change is significant to the Project and its environmental significance review under SEQRA.

91. Because the Additional Project Changes occurred after the Village denied the Applications and after entry of the Consent Order, the municipal agencies charged with implementing SEQRA (i.e. the ZBA and Planning Board)--and even the Court-- never received complete or accurate information about these or other issues affecting the Project.

**E.** **_Real dangers posed by the Consent Order_**

92. As the byproduct of the Providers' sue and settle tactic, the Consent Order is a compromise more so than the culmination of a comprehensive and well-studied land use project.

93. First, in bypassing NEPA and SEQRA review, the Project not only hurts the community burdened by its looming visual presence, but it will compromise the interests of the federal government and the Providers in creating more effective infrastructure with the help of local knowledge.

94. Secondly, the Consent Order is an end-around mandatory ESA review. Without any study of the Project's impacts on threatened and endangered species, its environmental impacts on them might well be irreversible.

95. Third, the Consent Order eliminates any discretion that the Code once invested in the Planning Board and ZBA to regulate uses within the Village, and to ensure that local and specific needs can be addressed by a representative and presumptively open process.

96.     And finally, the Consent Order has invested the Building Inspector with broad discretion to review and authorize significant and unstudied Project changes.  He did so unilaterally and without any environmental review analysis or SEQRA review. This eviscerates the statute's purpose and mandatory Code provisos discussed herein. And this was an illegal delegation of SEQRA review authority.

97.     For these reasons, the Consent Order is a fundamentally flawed, illegal, and dangerous litigation tool that should be vacated, annulled, and set aside.

98.     The Additional Project Changes, alone, warrant this Court granting such relief so that SEQRA can be implemented and actually followed, which the Providers even admit in their complaint was not done by the Village.[27]

### **Federal claims for relief**

### **Count I:**
### **Failure to comply with NEPA**

99.     Plaintiffs incorporate by reference all prior paragraphs.

100.    The FCC is a federal agency subject to NEPA.

101.    The FCC's implementing regulations apply to state and local agency implementation of NEPA through "little NEPAs" such as SEQRA.

102.    As a preliminary step, an agency may first determine whether the effects of an action may be significant.[28]

103.    Neither the ZBA nor the Planning Board conducted any environmental review of the Project before denying the Applications.

104.    The Village's review of the Project violated SEQRA by:

(a)     failing to determine whether the Project is subject to SEQRA;

---

[27] Complaint, ¶¶ 141-143 (Ex. A).
[28] 40 C.F.R. §§ 1501.4(b).  *See* 6 N.Y.C.R.R. §§ 617.4 and 617.5.

(b)    failing to notify all involved and interested agencies with respect to the Applications;

(c)    failing to make any SEQRA determination of significance, individually or collectively, relating to the Project; and

(d)    failing to identify any visual impacts from the Project or make any findings to that effect.

105.    Neither the parties to the DJ Action nor the Court conducted any environmental review of the Project before adopting the Consent Order.

106.    Neither the ZBA, Planning Board, nor the parties to the DJ Action provided any legally sufficient justification for failing to comply with NEPA in denying the Applications, and then in adopting the Consent Order.

107.    The Consent Order is unlawful because it conflicts with NEPA's text, structure, and purpose.

108.    The Consent Order violates NEPA by adopting provisions that, both individually and collectively, conflict with its overriding purposes of environmental protection, public participation, and informed decision making. Specifically, the Consent Order summarily designates the actions encompassed by the Project as being "Type II" under SEQRA because they constitute "actions of any court."[29] This designation, however, is misleading and false because the sum of its constituent parts rise to a level of significance under SEQRA, and the Consent Order authorizes further discretionary actions yielding the possibility of potential significance thereafter.

---

[29] 6 N.Y.C.R.R. § 617.5(c)(46).

109.   Any order that leaves some discretion as to the methods of implementing the order will, in turn, render those discretionary aspects of the action as potentially subject to SEQR review.[30]   Here, the Consent Order does just that.  After its execution, it vested review authority and discretion in the Building Inspector, who then reviewed and authorized the Additional Project Changes.

110.   Neither the Village nor any of the parties to the DJ Action supply any explanation underlying the Project's Type II determination under SEQRA in the Consent Order before its execution.

111.   SEQRA requires that a reviewing agency take a "hard look" at all the relevant areas of environmental concern and make a "'reasoned elaboration' of the basis for [its] determination.[31]

112.   In summarily denying the Applications, the Village failed to take the mandatory "hard look" at the Project's potential environmental impacts.

113.   The SEQRA process had not even been started before the Village denied the first of the Applications.  And SEQRA was not implemented any further between denying the Applications, commencing the DJ Action, and executing the Consent Order.

114.   Adopting the Consent Order without any further SEQRA review was arbitrary and capricious, an abuse of discretion, and contrary to NEPA's procedural and substantive requirements.

115.   As such, the Consent Order is contrary to NEPA's mandates and must be vacated, annulled, and set aside.

---

[30] *See* N.Y. Dept. of Envtl. Conserv., SEQR Handbook, 4th Ed. (2019) at 40.
[31] J*ackson v. N.Y. State Urban Dev. Corp.*, 67 N.Y.2d 400, 417 (1986), *citing*, *Aldrich v. Pattison*, 107 A.D.2d 258, 265 (2d Dep't 1985).

**Count II:**
**Failure to comply with the ESA**

116.    Plaintiffs incorporate by reference all prior paragraphs.

117.    The ESA mandates that the FCC and, derivatively, the Village ensure that development activities including the construction and operation of wireless telecommunications facilities is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species.[32]

118.    Here, at least two (2) species of mammals in the location of the Premises and the Project could be affected by activities on the Premises:

    (a)    Indiana Bat (*Myotis sodalis*), which is currently listed as "Endangered"; and

    (b)    Northern Long-eared Bat (*Myotis septentrionalis*), which is currently listed as "Threatened".[33]

119.    The ESA requires that, through consultation, the Village ensures that the Project does not jeopardize the continued existence of threatened or endangered species including the Indiana Bat and Northern Long-eared Bat.

120.    The Consent Order was adopted without independently ensuring that the contemplated actions will not jeopardize the continued existence of threatened or endangered species including the Indiana Bat and Northern Long-eared Bat.

121.    As a result, the Consent Order violations ESA § 1536(a)(2) because neither the Village nor the Providers ensured that the actions encompassed by the Project would

---

[32] 16 U.S.C. § 1536(a)(2).
[33] IPaC (Information for Planning and Consultation), which is maintained by the United States Fish and Wildlife Services, identifies species and habitats known or expected to be known in the Project location is available at:
 https://ecos.fws.gov/ipac/location/ERNDMEX5VNHBBPVU2DOZR6EQEM/resources.

not jeopardize the continued existence of threatened or endangered species including the Indiana Bat and Northern Long-eared Bat.

122.    The ESA requires that the Village and Providers ensure that the Project will not result in the "destruction or adverse modification of [critical] habitats."[34]  The Village and Providers are required to analyze the impact of removing critical habitats on both the survival and recovery of threatened or endangered species including the Indiana Bat and Northern Long-eared Bat.

123.    The Village and Providers have violated the ESA because in failing to conduct any mandatory review of critical habitats or threated and endangered species nearby the Project and the Premises, they have failed to ensure that the Project and its constituent actions will not destroy, or adversely modify, critical habitats for the Indiana Bat and Northern Long-eared Bat.

124.    The actions of the Village and Providers violate the ESA and are actionable under 16 U.S.C. § 1540(g)(1)(A).

125.    Therefore, the adoption of the Consent Order violates ESA § 1536(a)(2) making it arbitrary, capricious, and abuse of discretion, and actionable pursuant to 5 U.S.C. 706(2)(A).

126.    The Consent Order must be vacated, annulled, and set aside.

[intentionally left blank]

---

[34] 16 U.S.C. § 1536(a)(2).

## Count III:
## Illegal contract zoning

127.    Plaintiffs incorporate by reference all prior paragraphs.

128.    The reserved powers doctrine recognizes that "the power of governing is a trust committed by the people to the government, no part of which can be granted away."[35]

129.    In the land use context, the "contract zoning" doctrine is a refinement of this general precept barring municipalities from entering into contracts, including settlement agreements, in which they agree to grant variances, rezone land, or amend master land-use plans.  This is because "[z]oning is an exercise of the police power to serve the common good and general welfare" making it fundamental that these legislative functions "may not be surrendered or curtailed by bargain or its exercise controlled by the considerations which enter into the law of contracts."[36]

130.    Here, the Consent Order was not the result of bilateral negotiations at arm's length.  Instead, it was procured due to the press of litigation in the DJ Action and the Providers leveraging the weight of their federal claims and resources to the disadvantage of the Village.

131.    The Consent Order is a *de facto* approval of the Providers' special use permit application, application for a variance with respect to Village Law § 7-736, and grant of site plan approval for the Project subject to securing a building permit on conditions reserved to the Building Inspector's discretion.

---

[35] *Stone v. Mississippi*, 101 U.S. 814, 820 (1879).
[36] *V.F. Zahodiakin Eng'g Corp. v. Zoning Bd. of Adjustment,* 86 A.2d 127, 131 (N.J. 1952)*, cited by, Church v. Town of Islip,* 8 A.D.2d 962 (2d Dep't 1959).

132.    Certain elements of the Consent Order bargain away the Village's exercise of its zoning controls and police powers in exchange for the conditionally approving the Project.  For example, it requires that the Village "shall issue a building permit for the Facility within 15 days of receipt of a complete application," and reserves to the Building Inspector certain discretionary elements that would otherwise be reserved to the Planning Board during site plan review.[37]  (Consent Order ¶¶ 2-3).

133.    By executing the Consent Order, the Village ostensibly made policy determinations and interpretations concerning the legality of the Project.  And then it created legal mandates and restrictions that will bind Homeland and its successors.

134.    The Consent Order is not a permissible form of conditional zoning because (i) it promotes private interests at the expense of the general welfare; (ii) the authorized uses of the Premises constitute spot zoning; (iii) certain conditions are unreasonable and illegal;[38] and (iv) the Village improperly divested itself of its police powers in so doing.

135.    The Consent Order does not embody the type of reasonable development concessions as between a property owner and a municipality.

136.    Rather, it reflects the consummation of an ill-fated administrative and environmental review process that was achieved through attrition in the DJ Action where the Plaintiffs' interests were inadequately represented, at best.

[37] The Consent Order vaguely references security and lighting systems that will be designed to minimize or eliminate light pollution, Facility design to minimize noise pollution, monopine tower color, appearance, and design, and vegetative screening that will be subject to the Building Inspector's review and approval when, in fact, these decisions should properly be determined by the Planning Board.  (Consent Decree, ¶ 2).

[38] For example, the Consent Order dubiously recites that "the Village makes no representation whatsoever whether the ability or authority to construct or maintain the proposed improvements in Exhibit A are within the rights Plaintiffs claim under the "Existing Rockledge Road Access Easement (Liber 667, pg. 615) referenced therein."  (Consent Order, ¶ 8).  Clearly, this is not an unqualified admission that Homeland has access to the Premises as required by Village Law § 7-736.

137.    The Consent Order's failure to comply with federal and state environmental laws, and their implementing regulations, as described herein also constitutes a violation of the Code's requirements for issuing special use permits for wireless communications towers.   Specifically, Code § 188-70 entitled "Standards for issuing special permits" imparts mandatory ZBA findings:

> A. No special permit for a communications tower or a communications antenna installation shall be granted absent a finding by the Zoning Board that the applicant has met the following criteria:
>
> (1) That the application complies with all requirements of New York State Fire Prevention and Building Code, as well as all applicable state and federal regulations.

138.    The ZBA did not make such findings.

139.    Because the Consent Order constituted a *de facto* issuance of a special use permit without the mandatory finding of legal compliance, it was unlawful.

140.    The Village's failure to comply with all state and federal environmental regulations and failure to issue a mandatory finding of such compliance contradicts the letter and spirit of the Consent Order itself:  specifically, Paragraph 4:  "nothing in this Consent Order shall be construed to mean that the Facility does not need to comply with all applicable existing laws."

141.    In reality, the Consent Order and the processes undertaken both before and after its adoption were an end-run around existing laws and regulations that were not intended to be bypassed.

142.    As such, the Consent Order is contrary to NEPA's mandates and the Code, it must be vacated, annulled, and set aside.

## Count IV:
## Claim for declaratory relief under 28 U.S.C. § 2201(a)

143.    Plaintiffs incorporate by reference all prior paragraphs.

144.    Pursuant to 28 U.S.C. § 2201(a), Plaintiffs are entitled to a declaration of the rights and other legal relations of the parties with respect to the claims set forth in Counts I-III, above.

## State law claims for relief

## Count V:
## Declaratory judgment - Building Inspector actions *ultra vires* and void

145.    Plaintiffs incorporate by reference all prior paragraphs.

146.    The Building Permit incorporates the Additional Project Changes, which parameters materially altered the physical arrangement, layout, and design of the Project and the Premises.

147.    These land uses and site plan elements were not reviewed, modified, or approved by the Planning Board, ZBA, or by the court in the DJ Action.

148.    The Additional Project Changes bypass environmental significance review procedures codified by SEQRA and site plan regulations promulgated in the Code and, instead, substitute in their place the Building Permit.  This is illegal and violates SEQRA and the Code.

149.    The Consent Order, Additional Project Changes, and Building Permit masquerade as a self-executing form of municipal action.  In reality, neither SEQRA, nor the Code authorize such unilateral decision-making that entirely bypasses such public review and participation in site planning and environmental significance review.

150.    An actual and justiciable controversy exists between the parties insofar as Petitioners contend that the Consent Order, Additional Project Changes, and Building

Permit are illegal and void as violate SEQRA and the Code by circumventing mandatory environmental significance review.

151.    Because the Building Inspector exceeded his authority in unilaterally reviewing and approving the Additional Project Changes and then issuing the Building Permit, his actions where thus *ultra vires* and an improper delegation of SEQRA review authority.

152.    As such, the Building Permit has no legal force and should be declared a nullity as a matter of law.

153.    Petitioners thus seek a judicial declaration that the adoption, form, and contents of the Building Permit are illegal and void *ab initio*, and must be vacated, annulled, and set aside.

154.    Plaintiffs have no adequate remedy at law.

### Count VI:
### Declaratory judgment - final action proceeding without environmental review

155.    Plaintiffs incorporate by reference all prior paragraphs as though set forth herein.

156.    An "action" under SEQRA is broadly defined to include:

(1)    projects or physical activities, such as construction or other activities that may affect the environment by changing the use, appearance or condition of any natural resource or structure, that . . . require one or more . . . approvals from an agency or agencies;

(2)    agency planning and policy making activities that may affect the environment and commit the agency to a definite course of future decisions;

(3)    adoption of agency rules, regulations and procedures, including local laws, codes, ordinates, executive orders and resolutions that may affect the environment;

(4)    any combinations of the above.[39]

157.    The Building Inspector 's actions in reviewing the Additional Project Changes and in the Building Permit each constituted an "action" under SEQRA.

158.    The Building Inspector failed to thoroughly analyze and reason through all significant adverse environmental impacts attendant to the Project, many of which were dismissed or improperly characterized as insignificant.

159.    The Project has undergone significant changes and revisions since the Applications were denied on May 30, 2018, since the Consent Order was executed on January 30, 2020, and since the Building Inspector reviewed the Additional Project Changes and issued the Building Permit on June 15, 2020.[40]

160.    Because the Building Inspector's final action in issuing the Building Permit did not account for the Project's attendant environmental impacts, it was unlawful and arbitrary and capricious.

161.    Respondents should be enjoined from taking any steps in furtherance of the Building Permit or its conditions until the SEQRA process for the Project has been acceptably completed.

162.    Plaintiffs have no adequate remedy at law.

---

[39] 6 N.Y.C.R.R. § 617.2(b).

[40] 6 NYCRR §§ 617.7(e)-(f).

**Count VII:**
**For an order and judgment pursuant to CPLR § 7803(3)**

163.    Petitioners incorporate by reference all prior paragraphs.

164.    The Village did not properly implement SEQRA in bypassing its mandatory functions including environmental significance review by improperly delegating SEQRA review authority to the Building Inspector.

165.    These flaws were then ratified by executing the Consent Order.

166.    The Building Inspector's subsequent and discretionary actions in approving the Additional Project Changes and in issuing the Building Permit bypassed mandatory SEQRA review.

167.    The Consent Order and Building Permit are arbitrary, capricious, and irrational as there are no factual or legal bases to support approving the Project and its significant and unstudied changes without mandatory SEQRA review as prescribed by SEQRA and the Code.

168.    Accordingly, the Consent Order and Building Permit must be vacated, annulled and set aside.

[intentionally left blank]

**Prayer for relief**

**WHEREFORE**, Plaintiffs/Petitioners demand judgment against

Defendants/Respondents:

(a)     For a declaratory judgment vacating, annulling, and setting aside
the Consent Order and Building Permit or, alternatively, enjoining
and restraining the Providers from performing any construction and
site development on the Premises pursuant to the Building Permit;

(b)     For an order and judgment pursuant to CPLR § 7803(3) declaring
the Building Permit as being arbitrary, capricious, and an abuse of
discretion and *ultra vires* and void because the Building Inspector
exceeded his limited purview and grant of authority and the Code,
and in bypassing mandatory SEQRA review of the Additional Project
Changes;

(c)     Awarding Plaintiffs/Petitioners the costs and disbursements of this
action; and

(d)     For such other and further relief as this Honorable Court deems just,
proper, and equitable.

Dated:  Brewster, New York
         October 14, 2020

Respectfully submitted,

**MICHAEL V. CARUSO, P.C.**

By: ___/s/ *Michael V. Caruso*___
Michael Vincent Caruso (MC0117)
3871 Danbury Road
Brewster, New York 10509
Tel:  (845) 207-5452
Fax: (845) 251-0002

*Attorneys for plaintiffs/petitioners*